UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  11-23873-CIV-SEITZ/SIMONTON

SAGAAN DEVELOPMENTS AND
TRADING LTD.,

       Plaintiff,

vs.

QUAIL CRUISES SHIP MANAGEMENT
a/k/a HAPPY CRUISES, S.A., JEWEL OWNER
LTD., and INTERNATIONAL SHIPPING
PARTNERS,

       Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendant International Shipping Partners' Motion for Summary Judgment [DE 41], Defendant Jewel Owner, LTD.'s Motion for Summary Judgment [DE 42], and Plaintiff's Incorporated Cross-Motion for Summary Judgment [DE 50].  This is a contract case in admiralty.  Plaintiff, Sagaan Developments and Trading, LTD. ("Sagaan") supplied two lots of marine fuel, also known as bunkers, to the M/V Gemini, a cruise ship that Defendant Quail Cruises Ship Management a/k/a Happy Cruises, S.A. ("Quail") had chartered from Defendant Jewel Owner, LTD. ("Jewel").  Quail did not pay for either bunker.[1]

Sagaan's three count complaint[2] seeks to recover the bunkers' cost of $511,000 from the vessel's owner, Defendant Jewel, and Defendant International Shipping Partners ("ISP"), which managed the vessel's operations for Jewel.  Defendants counter they do not owe a duty to Plaintiff

---

[1] Nor has Quail answered this lawsuit. A Clerk's Default [DE 47] was entered against it on February 25, 2013, as it failed to appear, answer, or otherwise respond to the Complaint [DE 1], despite having been served. (*See* Clerk's Default; Aff. of Serv. [DE 38] ).  Here, unless otherwise indicated, "defendants" refers only to Jewel and ISP.

[2] The Complaint's three counts are: (I) Breach of Contract; (II) Account Stated; and (III) Unjust Enrichment/Quantum Meruit.

since they were not a party to the sales contract between Sagaan and Quail, were not unjustly enriched by Sagaan's delivery of fuel to Quail, and should not be made to pay to make Sagaan whole.

The Court has considered Jewel and ISP's motions, Plaintiff's opposition and cross motion for summary judgment [DE 50], Defendants' reply and response to Plaintiff's cross motion for summary judgment [DE 59], and Plaintiff's reply [DE 62]. While there is no dispute that Plaintiff has suffered losses in excess of $500,000, upon review of the record evidence, there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law. Neither Jewel nor ISP owe Plaintiff a contractual duty, and neither was unjustly enriched by Plaintiff's performance of the underlying fuel delivery contract. Accordingly, the Court grants the defendants' motions for summary judgment.

## I.    BACKGROUND[3]

Quail Cruises chartered the M/V Gemini from Jewel to operate a cruise line trade named "Happy Cruises." Quail operated the Gemini under a standard time charter, meaning Quail had exclusive use of the Gemini for a set time and during the charter period Quail could undertake as many voyages as it wanted. Quail determined where the Gemini would sail, at which ports it would call, and most important for purposes of this case, Quail was solely liable for arranging for the ship's fuel and paying for it. Under the agreement, Jewel, continued to operate the vessel for Quail, but Jewel contracted with ISP, a professional ship manager, to manage virtually every aspect of the Gemini's operations and management on Jewel's behalf.[4] The Gemini charter started on March 30, 2009 and was to have run until October 14, 2012, but Quail had financial problems. On September

---

[3] The background is derived from the undisputed facts unless otherwise stated.

[4] Jewel is a single-asset entity formed by a Danish company, the Clipper Group, solely for the purpose of owning the Gemini. It has a board of directors and employs the Gemini's deck and engine crew but ISP manages Jewel's administration and finances.

26, 2011, less than two weeks after Sagaan delivered the second bunker, Quail issued a press release announcing it was canceling its remaining cruises for 2011.

The question presented in this case is whether Jewel and/or ISP are liable to Plaintiff for Quail's non-payment of the bunkers under theories of breach of implied-in-fact contract, account stated, and/or unjust enrichment. Therefore, certain facts concerning the bunker delivery process and the time-charter relationship between Quail and Jewel and ISP are relevant. Accordingly, each of these is discussed in turn.

### A. *The Bunker Delivery Process*

The two bunker deliveries at issue occurred on August 29, 2011, and September 13, 2011, at the Port of St. Petersburg, Russia.[5]   It is undisputed that the Plaintiff negotiated the underlying supply contract with Quail alone. There are no written contracts between Sagaan and either Jewel or ISP, because, as is discussed below, the Gemini was on time charter to Quail.   Under the time charter agreement, Jewel sailed the ship, but Quail, literally, set the course.   The Gemini sailed according to Quail's itinerary.   Accordingly, the Chief Engineer requisitioned fuel for the vessel based on where Quail determined the Gemini would call.

The process of bunkering the vessel started with the Chief Engineer requesting fuel from Quail's Technical Manager.[6]   After that, Quail exclusively handled the negotiations and purchasing.

---

[5]  Sagaan's performance is not at issue. It is undisputed that Sagaan delivered both bunkers as required.

[6]  The parties dispute whether the Chief Engineer had the authority to order fuel. [DE 41 ¶2]. Plaintiff claims the Chief Engineer could order fuel, the defendants claim he could not. However, because it is undisputed that the defendants did not order the fuel in this case, whether the Chief Engineer could order fuel is not relevant. However, the Court briefly discusses the issue here because Plaintiff raises the Chief Engineer's activities with regard to bunkering in its argument for denying summary judgment to Defendants on the breach of contract claim.

The dispute, it would seem, is based on the meaning of the word "order." Plaintiff argues that "The Chief Engineer, whether the vessel is on charter to QUAIL (or any other third party) or not, was and remains an employee of JEWEL, who is responsible for arranging for bunker delivery, requesting bunkers to be delivered, and overseeing and signing for the bunkers which are delivered." [DE 62, p. 2] (record citations omitted). However, the deposition of ISP's Vice President of Marine Operations, Nick Inglis, which Plaintiff cites, states "the Chief Engineer requests fuel . . . it's up to Quail to decide how much of that they are actually going to deliver. . ." (Deposition of Nick Inglis ("Inglis Dep.") (DE-41), pp. 62 – 63). Moreover, when Inglis was asked "During the charter party period, who had the authority to order bunkers to the vessel?" He answered, "Happy Cruises."
Q: "Anybody else?"
A: "No." (*Id.* at p. 20).

Quail's Technical Manager nominated Sagaan, communicated the requirements to Sagaan, and arranged with Sagaan for delivery. Quail's Technical Manager was Enrique Dopico. His counterpart in the negotiations at Sagaan was Sergey Lunev. Dopico and Lunev finalized the negotiations with an exchange of e-mails on August 17, 2011.

Following the negotiations, Sagaan issued a "Bunker Confirmation" dated August 18, 2011. The bunker confirmation was addressed to Happy Cruises, S.A. Madrid and to the attention of Mr. Miguel Mounir of Happy Cruises. Mounir was Quail's Executive Vice President of Operations. Happy Cruises and Mounir were the only listed recipients on the document. The bunker confirmation reiterated the terms Dopico negotiated and earlier confirmed with Lunev in the August 17th e-mail. Payment was due 30 days from the date of delivery. The following language appears on the confirmation:

> Account/Buyer:   Master and/or Owners and/or Charters and/or
> Operators and/or Managing Agents and/or
> HAPPY CRUISES, S.A. Panama c/o HAPPY
> CRUISES, S.A. Madrid
>                              (DE 1-1, Ex. 1).

There is no evidence to suggest that Sagaan also sent a copy of this confirmation to either Jewel or ISP. Sagaan's third-party agent delivered the fuel to the ship as required. Jewel's Chief Engineer counter-signed the delivery receipt, stamped the receipt as delivered, and confirmed by e-mail to the Technical Manager that fuel had been received in both transactions.

### B. The Time Charter Agreement between Quail and Jewel

More than two years before the bunker deliveries at issue, Quail and Jewel signed the charter party agreement that gave Quail use of the vessel. The agreement between Quail and Jewel was a standard time charter which was to have run from March 30, 2009 through October 14, 2012. The charter party agreement was memorialized in a two-part document. Part 1 is a standard BIMCO

---

On balance, the record reflects the Chief Engineer "ordered" the fuel insofar as he communicated requirements to Quail. Quail exclusively dealt with the suppliers. *Id.*, p. 16; p. 50.)

Uniform Time-Charter document on the BALTIME 1939 (As Revised 2001) form.[7]  Part 2 contains specific clauses related to the charter.[8]  Paragraph 4 of the BALTIME 1939 form sets out the Charterers' obligations.  Quail's obligation under the agreement to provide and pay for fuel is clearly set out in line one:

> **The Charterers shall provide and pay for all fuel oil . . .** (emphasis added). ((Deposition of Neils-Erik Lund ("Lund Dep.") (DE 41-1), Ex. 3))

Under a time charter agreement, the charterer controls at which ports the ship calls and where it sails.  For its part, the owner's principal on-going obligation is to navigate, operate, and manage the vessel for the benefit of the charterer.  In exchange, the charterer pays the owner a fee known as charter hire.  The daily rate of hire was €34,000.[9]  The agreement entitled Jewel to this fee regardless of whether the Gemini was underway, in port, or had passengers aboard.  The charter hire was to be paid every two weeks, but starting in February 2011 Quail fell behind in its payments and it was consistently in default until the charter was terminated.  Jewel gave Quail notice on May 19, 2011, that it was terminating Quail's charter pursuant to a provision in the agreement that allowed for termination on the basis of substantial, accrued arrears in the charter hire payment.  By the end of June 2011, Quail owed Jewel €1,428,000 in back payments.

Representatives of Quail, Jewel, and the Clipper Group, Jewel's parent company, met in Copenhagen on May 25, 2011, to negotiate a settlement.  Quail agreed to a payment schedule that would have made it current on its payments, provided that Quail had continued use of the Gemini to run its 2011 summer cruise season.  But, when Quail ceased operations in late-September 2011, it was still nearly €2,000,000 in arrears.  Jewel mitigated its losses, in part, by executing on a

---

[7]  The Baltic and International Maritime Council (BIMCO) is the world's largest international shipping association.  The BALTIME 1939 form is one of three standard forms used in time chartering.  2 Thomas J. Schoenbaum, Admiralty and Maritime Law §11-2 (5th ed. 2011); *See also Miletic v. Holm and Wonslid*, 294 F.Supp 772 (S.D.N.Y. 1968) (describing the BALTIME form as "well-known" in the charter industry.)

[8]  The rate of hire, duration, ship facility requirements, and other matters are addressed in part 2 of the charter party agreement but none of these are at issue here.

[9]  This was the daily charter hire rate at the time of the relevant events.  The hire rate was scheduled to increase every year of the charter.

€2,500,000 first-class bank guarantee it obtained from Quail in the original charter party agreement, but Quail still owed Jewel more money than Jewel recovered under the bank guarantee. Quail owed Jewel, and Pearl Owner, another Clipper Group ship-owning entity, nearly €1,500,000 for crew repatriation costs.

## II. ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)).  The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

### B.  Motions for Summary Judgment

Though Plaintiff has conceded that there were no written agreements between it and Jewel or ISP, Plaintiff nonetheless alleges in Count I of its complaint that these defendants breached a contract.   In this vein, Plaintiff makes a previously unpled allegation in its opposition and cross motion for summary judgment [DE 50] that Defendants breached an implied-in-fact contract. Plaintiff also alleges account stated and unjust enrichment in Courts II and III of the Complaint

respectively. Plaintiff's attempt to shoehorn the facts of this case into these legal theories is unavailing. The record evidence does not support any of Plaintiff's theories.

Defendants seek summary judgment on all counts. On the breach of contract and account stated claims, Defendants argue they never contracted with Plaintiff, are not obligated to pay for Quail's default, and accordingly, should be granted summary judgment on both claims. On the unjust enrichment claim, Defendants argue that they were not benefited by Sagaan's delivery of fuel to Quail and that Sagaan's performance of its agreement with Quail was immaterial to them because Defendants were paid regardless of whether the Gemini was fueled and moving or not.

Defendants have sufficiently demonstrated the absence of a genuine issue of material fact, and as the non-moving party Plaintiff must show specific facts that require resolution by trial. This is a tall order given that the only testimonial evidence filed in the case thus far is the depositions of three ISP employees. That evidence, taken with the documentary evidence related to the transactions, and the charter-party agreement, clearly establishes that this transaction occurred in the normal course of the bunkering of a ship on charter and that Defendants were not parties to the bunker transaction. There are no disputed factual issues which must be resolved at trial. Accordingly, Defendants prevail on both counts as a matter of law.

However, Plaintiff does submit that there are no disputed material issues of fact as to Defendants' unjust enrichment at its expense. [DE 50, p.3]. It argues that Defendants were unjustly enriched because Quail used the fuel bunkers Sagaan delivered to sail three cruises in August and September 2011, and in that time made €1,400,000 in back charter hire payments to Jewel. Plaintiff cross-moves for summary judgment on this claim. By cross-moving for summary judgment, the parties agree that there is no issue of material fact and that the sole issues are questions of law for the Court's determination. The Court finds the defendants were not unjustly enriched and also grants summary judgment for defendants on Claim III.

### C.   Substantive Law of Admiralty

Plaintiff's claims sound in admiralty.  For the substantive law to be applied in an admiralty

case, courts first look to statutory law and then to "judicially created maritime principals."  *Coastal*

*Fuels Marketing, Inc. v. Florida Exp. Shipping Co., Inc.*, 207 F.3d 1247, 1251 (11th Cir. 2000).  In

the absence of statutory law and federal judicially created maritime principals, federal courts may

turn to state law to resolve maritime contract disputes.  *See Ham Marine, Inc. v. Dresser Industries,*

*Inc.* 72 F.3d 454 (5th Cir. 1995).  Accordingly, where appropriate, the Court applies Florida law.[10]

### D.   Breach of Contract

---

[10] Defendant responds to Plaintiff's arguments on breach of contract that Florida law is inapplicable because the contract was not entered into in Florida.  Rather, Defendant cites Clause 19 of Sagaan's General Terms and Conditions which stipulates English law will be applied and that English Courts have jurisdiction.  Defendant claims English law does not recognize implied-in-fact contracts.  Defendants have provided the Court with a copy of a Queen's Bench Division Admiralty Court case, titled *The Yuta Bondarovskaya*, [1997] 2 Lloyd's Rep. 357, where an English Court refused to hold an owner liable for a charterer's default on payments to a supplier.  However, Plaintiff is not seeking to bind Defendants to the contract between Sagaan and Quail.  Rather, its argument is that a separate contract should be inferred from Defendant's conduct in the bunker transaction.  Accordingly, the choice of law provision in Sagaan and Quail's contract is not applicable to other choice of law matters in the case.

The Court notes that neither party briefed, or even addressed, the choice of law issue, which is surprising given the international nature of the dispute.  The bunkers were delivered in Russia by a bunker-supplier incorporated in the British Virgin Islands, on account of a charterer based in Spain, for a Maltese flagged vessel, owned by a Bahamian entity, and managed by an American company that operates from Miami, Florida.  In an admiralty contracts case the choice of law analysis turns on which "sovereign entity has the most significant relationship with the transaction at issue."  *Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377, 1382 (11th Cir. 1989).  Aside from Defendants' objection discussed above, both parties would seem to be in agreement that Florida law applies.  Both parties have cited it frequently throughout their briefs.  *See Wallace v. NCL (Bahamas) Ltd.*, 891 F.Supp.2d 1343, 1351 (Jordan, J.) (declining to *sua sponte* undertake choice of law analysis under same circumstances).

The parties carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case.  *See Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir.1996)(holding that party waived conflicts of law issue because it failed to fulfill its obligation under Fed R. Civ. P. 44.1 "to provide the district court with 'reasonable notice' of his intention to raise an issue of foreign law."); Restatement (Second) Conflict of Laws § 136 cmt. f (1971) ("[T]he party who claims that the foreign law is different from the local law of the forum has the burden of establishing the content of the foreign law.").  Where parties fail to satisfy either burden the court will ordinarily apply the forum's law. *See Walter v. Netherlands Mead N.V.*, 514 F.2d 1130, 1137 n. 14 (3d Cir.1975); *see also Banco de Credito Indus. v. Tesoreria General*, 990 F.2d 827, 837 (5th Cir.1993)("When the parties have failed to conclusively establish foreign law, a court is entitled to look to its own forum's law in order to fill any gaps."); *Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Constr. Corp.,* 558 F.2d 948, 952 (9th Cir.1977) (applying forum law where parties failed to raise issue of foreign law's applicability); Restatement (Second) Conflict of Laws § 136 cmt. h (1971) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own law, except when to do so would not meet the needs of the case or would not be in the interests of justice.").

Plaintiff concedes there was no written contract between Sagaan and Defendants Jewel and ISP. Rather, Plaintiff argues for the first time in its opposition and cross motion for summary judgment [DE 50] that an implied-in-fact contract obligates Jewel and ISP to pay Sagaan for the bunkers. Implied-in-fact contracts are those "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592 (1923).

i.     *Plaintiff Cannot Amend its Complaint in its Response*

Problematically for Plaintiff, it cannot raise this implied-in-fact contract theory for the first time at the summary judgment stage. *Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004). The complaint does not allege a breach of an implied-in-fact contract nor does it provide the factual basis for why such a contract should be implied. Defendants are not required to infer all possible claims that could arise under the facts of the complaint. *Id.* Plaintiff's allegation is limited to what it pled within the four corners of the complaint unless otherwise amended pursuant to Federal Rule of Civil Procedure 15. In its complaint Plaintiff pled only breach of contract, not breach of implied-in-fact contract. Plaintiff now concedes no written contract exists. Accordingly, the Court finds that summary judgment as to Claim I is warranted.

ii.     *No Contract can be Implied-in-Fact Because of the Pre-existing Time Charter*

If Plaintiff's breach of implied-in-fact contract claim as "amended" by its opposition papers were permitted, it would fail, even when taken in the light most favorable to Plaintiff. An implied-in-fact contract is a true contract and requires all necessary elements of a binding agreement, including mutual assent. WILLISTON ON CONTRACTS §1:5 (4th ed. 1990). Here, mutual assent to contract between Sagaan and Jewel cannot be inferred because Jewel, and ISP as Jewel's manager, conducted themselves only in accord with their obligations under the charter party agreement and not according to a tacit deal either had with Sagaan.

9

The time charter is routine practice in the marine transport industry. "The general scheme of a time charter is that the owner turns over a fully equipped ship to the charterer and operates the ship for the charterer's benefit, being compensated by monthly hire. . . The owner pays the ordinary running expenses as are specially incident to the trade in which he employs her. In general terms, on most time charters, the owners pay the crews wages and supply their food, pay for engine room stores, keep the vessel repaired and pay for insurance, *almost everything else falls upon the charterer.*" *Marcial Ucin, S.A. v. SS Galicia*, 723 F.2d 994 (1st Cir. 1983) (emphasis original) (internal citations and quotations omitted).

As an industry participant, Sagaan was undoubtedly aware that neither Jewel nor ISP were obligated to pay for the Gemini's fuel while she was under charter, provided of course that Sagaan knew the Gemini was under charter when it sold Quail the bunkers.[11] But whether Sagaan knew the Gemini was under charter is not critical because, as contract formation requires mutual assent, Jewel and ISP's non-assent to the contract is itself dispositive. Neither Jewel nor ISP had an obligation to pay for the Gemini's fuel and Plaintiff does not identify any evidence which suggests that in spite of this non-obligation, Jewel or ISP assented to undertaking this obligation.[12]

### E.  Account Stated

To prevail under an account stated theory, Plaintiff must prove that the defendant expressly or impliedly agreed that an amount owed was correct and, that the defendant promised to pay the balance. *Merrill-Stevens Dry Dock Co v. Corniche Exp.* 400 So.2d 1286 (Fla. 3d DCA 1981).

---

[11] Sagaan's bunker confirmation document itself specifically references "Owners" as distinct from "Charterers" or "Managers."

[12] Plaintiff points to the Chief Engineer's role in requisitioning the bunkers as indicative of the defendants' intent to be bound to a fuel contract with Sagaan. This Chief Engineers conduct in this regard is indicative only of the owner's obligation to operate the vessel on behalf of the charterer. Plaintiff also cites the bunker confirmation's noting that the fuel was supplied on account of "Master and/or Owners and/or Charters and/or Operators and/or Managing Agents and/or HAPPY CRUISES, S.A. Panama c/o HAPPY CRUISES, S.A. Madrid" as evidence that the defendants intended to be bound. There is no evidence that the confirmation was ever sent to either defendant and therefore, the confirmation is not probative of the defendants' intent.

Plaintiff's account stated claim fails for the same reason above, Jewel and ISP had no obligation to pay for fuel under the Charter Party Agreement.

An account stated must be based on prior dealings resulting in a subsisting debt. *Nicolaysen v. Flato*, 204 So.2d 547, 549 (Fla. 4th DCA 1967); *see also Nants v. F.D.I.C.*, 864 F.Supp 1211, 1220 (S.D. Fla. 1994) (explaining a plaintiff must show at the time of stating the account there had been previous dealings and transactions with the defendant.)  Here, the account stated was not based on prior dealings between Plaintiff and Jewel or Plaintiff and ISP, but between Plaintiff and Quail.  The charter party agreement squarely placed the burden and cost of ordering bunkers for the Gemini on Quail.  Plaintiff never dealt with Jewel or ISP until after the bunkers were delivered to the ship, and even then, these dealings were limited to the Chief Engineer receiving them on board.  Under such circumstances, account stated is not a cognizable claim.

### F.  *Unjust Enrichment*

Plaintiff argues, in the alternative, that Defendants were unjustly enriched by Plaintiff's delivery of the bunkers.  Specifically, Plaintiff claims that because Quail was able to operate the Gemini longer than it otherwise would have been able to, and, in that time, Quail paid charter hire to Jewel, Jewel and ISP were unjustly enriched.  Plaintiff concludes it would be inequitable to allow Defendant to retain the benefit of those payments in light of Quail's non-payment.  For Plaintiff to prevail under an unjust enrichment theory it must prove it conferred a benefit on the defendant. *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.,* 667 So.2d 876, 879 (Fla. 3d DCA 1996). The benefit must have been directly conferred. *Id.* If Plaintiff can show it directly benefited Defendants, it must then show that Defendants knew about the benefit, voluntarily accepted and retained the conferred benefit, and that it would be inequitable for Defendants to retain the benefit. *Commercial P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So.2d 383, 388 (Fla. 4th DCA 1997).

The parties have cross-moved for summary judgment on Plaintiff's unjust enrichment claim. Defendants prevail for two reasons. First, Plaintiff did not directly confer a benefit on Defendants. Second, Defendants were not "unjustly enriched" - the charter hire payments Defendants received were for good consideration and were part of a separate, pre-existing bargain with Quail. Under the circumstances, it is not inequitable for Defendants to retain them.

i.   *Plaintiff has not Shown it Directly Conferred a Benefit on Defendants*

Sagaan alleges that its delivery of fuel enabled Quail to make back charter hire payments of €2,185,000 between August 19 and September 16, 2011.[13] Plaintiff claims that by delivering fuel to Quail, Quail was able to sustain three additional cruises in August and September, and because they were able to continue operating, Quail was able to make back payments. [DE 62]. Plaintiff does not direct the Court to any authority, nor has the Court located such authority, that stands for the proposition that a marine supplier is entitled to disgorge charter payments made to an owner by a charterer because the charterer did not pay the supplier for necessaries supplied to the ship.

On its face, the argument is attenuated, especially since Plaintiff must show it provided Defendants a direct benefit. Here, that means Sagaan would have to show a causal connection between the three cruises its fuel allegedly enabled, the revenues generated therefrom, and any payments Quail made to ISP and Jewel. More specifically, Sagaan would have to prove that the fuel that it provided ultimately was used by Quail to generate revenue and that if the fuel was used to generate revenue, that money (as opposed to money from another source) was what was paid to Jewel and ISP. Plaintiff has not made this showing. In lieu of connecting the bunkers supplied by Plaintiff, to the cruises conducted by Quail, to the money Quail may have made on these cruises, to the contemporaneously made payments of back charter hire to Defendants, Plaintiff simply points to a ledger showing that between August 19 and September 16, Quail paid €2,185,000 in back charter

---

[13] Plaintiff acknowledges that not all of this money was owed to Jewel. Plaintiff points out that at least €1.4 million could be assigned to past due payments on the Gemini with the rest being owed by Quail for its use of the M/V Pearl. [DE 62, p. 4, fn. 1].

hire to Jewel.  Plaintiff argues that these payments, coupled with the fact that Jewel renegotiated a

payment schedule based on Quail's promising upcoming cruise season substantiates the unjust

enrichment claim and justifies a finding of summary judgment for Plaintiff. The fact remains,

however, Plaintiff has not carried its burden of showing it directly benefited the Defendants.  Even if

a marine supplier can disgorge charter hire payments made to an owner by a charterer that defaulted

on payment for marine necessaries, *this* Plaintiff certainly has not laid the necessary factual predicate

for recovery under such a theory.[14]  Therefore, the Court must deny Plaintiff's motion for summary

judgment.

> ii.      *Jewel was not "Unjustly" Enriched*

"When a defendant has given adequate consideration to someone for the benefit conferred, a

claim of unjust enrichment fails." *Amer. Safety Ins. Servs., Inc. v. Griggs*, 959 So.2d 322, 331-32

(Fla. 5th DCA, 2007); *see also Gene B.Glick Co., Inc. v. Sunshine Ready Concrete Co., Inc.*, 651

So.2d 190 (Fla. 4th DCA 1995) (describing unjust enrichment as equitable in nature and not available

where payment has been made for the benefit conferred).  Accordingly, Plaintiff's claim of unjust

enrichment fails because the payments Quail made to Jewel in August and September of 2011 were

not unjustly or unjustifiably attained.  Rather, they were the benefit of a bargain between Jewel and

Quail that was supported by mutual consideration.

Quail paid Jewel pursuant to a settlement agreement that pre-dated the contract between

Quail and Sagaan by over two months.  Quail was in arrears on its Charter hire payments since

February of 2011.[15]  In May 2011, Jewel gave notice to Quail that it intended to withdraw the Gemini

from Quail's charter if Quail did not make back charter payments within five days of the notice.  On

June 3, 2011, the parties reached a settlement and negotiated a payment schedule for the arrears in

---

[14] The Court does not reach a legal conclusion as to whether a supplier can disgorge an owner's charter hire payment after the charterer defaults on its payments to the supplier.  The Court notes that in such circumstances admiralty provides a remedy to the supplier in the form of its obtaining a maritime lien against the vessel and arresting it.
[15] It is unclear from the record the exact amount of the arrearage on June 3, 2011, but on June 30, 2011 Quail owed Jewel €2,663,496.83.

Quail's charter hire payments. At the time the settlement was negotiated, Jewel could have terminated the charter and retaken possession of the Gemini for non-payment of charter hire fees pursuant to Clause 6 of the Charter Party Agreement. Jewel, however, continued to provide Quail the use of the Gemini so Quail could run its business. In exchange, Jewel received scheduled payments of accrued arrears, including the payments in August and September.[16] Consequently, the payments Quail did make to Jewel were neither a gratuity, nor a windfall; they were made pursuant to an independent, previously existing contractual obligation. Nonetheless, Plaintiff looks to Defendants for restitution. But Defendants have already given something of value to receive the benefit that Plaintiff claims is unjustified, namely, the continued use of the Gemini by Quail throughout the summer of 2011. Restitution by Defendants is not justified as "[t]he law of quasi-contract does not require an owner to pay twice." *Commercial P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So.2d 383, 388 (Fla. 4th DCA 1997). Accordingly, the Court finds summary judgment for Defendants as to Count III.

Plaintiff also alleges that Defendants have unclean hands in that "Jewel and ISP continued to suffer Quail to employ the Gemini and to actively conceal from providers of goods and services that she had become financially unseaworthy by an operator who was carrying on a 'shoestring operation' business." [DE 50, p. 16]. Plaintiff suggests that Defendants' malfeasance should not be rewarded and seeks that the Court exercise its equitable power in admiralty and disgorge the value of the bunkers. *See Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515, 520 (2d Cir. 1979). For the reasons discussed above, Plaintiff's unjust enrichment claim fails as a matter of law. But, Plaintiff's argument here, that Defendants have unclean hands and should be stripped of benefits paid, is unsupported in fact and law and it fails on independent grounds.

---

[16] The settlement agreement between Quail and Jewel also extended to another owner entity, Pearl Owner. Quail was to have paid Jewel and Pearl, jointly, €9,825,000. This payment was to have been made in installments payable every Friday between June 3, 2011 and September 30, 2011. Quail, ultimately, failed to make €2,012,000 in payments, though it is unclear from the record how much of that was ascribable to the deficiency solely as to Jewel's account.

Sagaan argues that by renegotiating the payment terms of the charter in June, Jewel and ISP allowed Quail to maintain a business that was insolvent and that would visit financial harm on others. The record, however, indicates the Defendants did not know anything about Quail's dealings with its suppliers. It was not until September 28, 2011, when Sergay Lunev e-mailed Captain Inglis the first bunker invoice, that the Defendants would have had reason to know that Quail had outstanding debts with its suppliers.

Even if Defendants were aware that Quail owed its suppliers money, Plaintiff has not pointed to any authority that makes Defendants liable for renegotiating its agreement in light of such knowledge. Nor has Plaintiff directed the Court to authority that imposes an affirmative duty on a ship owner/manager to prevent a charterer from carrying on a "shoestring operation" business. Plaintiff cites to cases involving financial seaworthiness, but these cases concern the tort liability of financially unseaworthy cargo carriers and are non-instructive here, where the issue is whether a supplier may disgorge payments in quasi-contract from a ship owner based on the non-payment of a charterer who ordered the supplies. Nor has the Court located any authority that stands for either legal proposition that Plaintiff advances. Accordingly, for this additional reason, the Court grants summary judgment for Defendants.

## III. CONCLUSION

For the reasons set forth above, it is

ORDERED THAT

(1) Defendant International Shipping Partners Motion for Summary Judgment [DE 41], is GRANTED.

(2) Defendant Jewel Owner, LTD.'s Motion for Summary Judgment [DE 42], is GRANTED.

(3) Plaintiff's Incorporated Cross-Motion for Summary Judgment [DE 50] is DENIED.

(4) The Court will enter a separate judgment.

DONE AND ORDERED in Miami, Florida, this 22ⁿᵈ day of May, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    Honorable Andrea M. Simonton
       All counsel of record